**Horace ALTO, Independent Administrator of the Estate of Anthony Alto, deceased, Plaintiff,**

v.

**CITY OF CHICAGO, a municipal corporation; Kevin Evans, Anthony Bradley, Carole Love, Linda Williams and Marcus Grey, Defendants.**

No. 92 C 7234.

United States District Court, N.D. Illinois, Eastern Division.

Aug. 25, 1994.

Kevin G. Burke, Michael Gerard Mahoney, Corboy, Demetrio & Clifford, P.C., Chicago, IL, for plaintiff.

Kelly Raymond Welsh, James Patrick McCarthy, Gregory J. Wojkowski, Thaddeus S. Machnick, Timothy John Frenzer, David Mitchell Zinder, Robert W. Barber, John F. McGuire, Thomas R. Samson, Melvin L. Brooks, City of Chicago, Law Dept., Corp. Counsel, Chicago, IL, for defendants.

## MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

Plaintiff Horace Alto, as administrator of the estate of Anthony Alto, brings this six-count complaint against the City of Chicago and Chicago Police Officers Anthony Bradley, Kevin Evans, Marcus Grey, Carole Love and Linda Williams. Before this court is defendant Anthony Bradley's Motion for Summary Judgment on Counts V and VI, brought under 42 U.S.C. § 1983 (1988), and Counts III and IV, brought under the Illinois Wrongful Death Act, 740 ILCS 180/1, 180/2 (1993), and the Illinois Survival Act, 755 ILCS 5/27–6 (1993).[1] For the reasons set forth below, defendant's motion is granted in part and denied in part.

### I. Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(c), summary judgment is appropriate if "there is no genuine issue of material fact and ... the moving party is entitled to judgment as a matter of law." This standard places the initial burden on the moving party to identify "those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) (quoting Rule 56(c)). Once the moving party has met this burden of production, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(c); *see Maxwell v. City of Indianapolis,* 998 F.2d 431, 433 (7th Cir.1993). In deciding a motion for summary judgment, the court must read all facts in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 254, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986); *Casteel v. Pieschek,* 3 F.3d 1050, 1052 (7th Cir.1993).

### II. Background

On or about September 16, 1991, for reasons not entirely clear, Anthony Alto ("Alto") allegedly swung at Chicago Police Officer Robert Perkins with a wooden two-by-four. As Alto fled from the scene, Officer Perkins called for assistance over his radio and began chasing Alto. Officer Carole Love, who was in the area, heard Perkins' call over the radio and upon making visual contact with Alto, also began pursuit. After chasing Alto down 72nd Street, Love was informed by an eye-

---

1. Although all defendants are represented by the Corporation Counsel of the City of Chicago, curiously, only defendant Bradley has moved for summary judgment.

witness that Alto had entered the residence at 7222 South Rhodes Street. However, Love herself did not see Alto enter the house and chose not to enter the building. Love later spoke with Perkins, who relayed to her the circumstances surrounding Alto's earlier attack. However, Love did not follow-up on the matter and did not seek an arrest warrant for Alto.

Some two weeks later, on October 1, 1991, Love was on patrol with Officer Marcus Grey in a park near where the prior encounter with Alto had occurred. Love spotted Alto, and informed Grey that Alto was probably wanted for the prior attack on Perkins. Although the two officers were unable to contact Perkins over their radios to ascertain whether an arrest warrant had been issued for Alto, they nonetheless approached Alto to investigate further. Upon reaching him, both officers touched Alto's arm and Love indicated that they wished to speak with him. At this moment, Alto ran from the officers and out of the park. When Alto failed to obey Love's order to stop, Love and Grey gave chase. Love announced over her radio that she was in pursuit of a suspect wanted for the aggravated assault of a police officer. Love and Grey chased Alto to 7222 South Rhodes, where Love saw Alto enter the house.

As Officer Love entered the vestibule of the house she was met by three men, including Alto's brother and his father, Horace Alto. After a brief conversation with the three men, Love observed Alto in the hallway brandishing a knife approximately seven to eleven inches long and telling Love that he was not going to go to jail. Love radioed that Alto was now holding a knife, and told Alto to drop the weapon. However, Alto refused to drop the knife and a boisterous altercation ensued.

At about this time, Officers Anthony Bradley, Linda Williams and Kevin Evans, who were responding to Love's request for assistance, arrived at 7222 South Rhodes. Although Bradley had not heard that Alto was suspected of committing an aggravated assault against another police officer, he was aware that Alto was threatening fellow officers with a knife. Bradley and Evans ran around the back of the house, where they continued to hear shouting from inside the house concerning Alto's refusal to drop the knife. Both officers then drew their weapons and Bradley entered the rear of the building with Evans following him.

Once inside, the two officers moved toward the front of the building where the confrontation between Alto and the other officers was occurring. Upon approaching the front of the house, Bradley and Evans observed Alto with the knife in his hand. Bradley ordered Alto to back away from the front door and drop the knife. Alto complied with the first request, but refused to relinquish control of the knife and again stated his intention not to go to jail. After further requests by Bradley, Alto eventually threw the knife on a nearby bed. Bradley then ordered Alto to lay face down on the floor. Alto complied, but only after repeated directions from Bradley.[2] Bradley, still holding his firearm, then stepped over Alto in order to handcuff him. At that moment Alto jumped up, knocked Bradley backwards, and struck Bradley in the face with his fist. Alto then grabbed Bradley's weapon and the two struggled over the firearm. Although Bradley did not feel the trigger being pulled, the weapon discharged in the struggle and the two fell back onto a nearby chair. It was later determined that the bullet from Bradley's gun had caused a fatal wound in the left side of Alto's chest. Since Alto was still clutching the gun, Bradley pulled the weapon away from Alto as he pushed him away. Alto fell back onto a nearby couch and faced Officer Evans. Officer Evans then fired two shots at Alto. At this time additional police officers entered the room and the emergency personnel were summoned. Alto died sometime later due to the gunshot wounds he sustained.

### III. Discussion

A. Section 1983 Claims (Counts V and VI)

Essentially, plaintiff claims that Bradley violated Alto's federal civil rights in two

---

2. The parties dispute whether Alto was lying completely flat with his arms alongside him, or whether Alto was in a push-up position. However, we find that the exact posture of the decedent at the time of the incident is not a material fact for purposes of deciding Bradley's motion.

ways: (1) conducting a nonconsensual, warrantless entry into Alto's home, and (2) using excessive force in entering the home with his weapon drawn.[3] Bradley moves for summary judgment on Counts V and VI, arguing that his entry into the house with weapon drawn was reasonable under the Fourth Amendment to the United States Constitution, and that he is entitled to protection from civil liability because of qualified immunity. We begin our discussion with the issue of qualified immunity, since it is dispositive of Bradley's attack on plaintiff's federal claims.

■ Because qualified immunity is not simply an affirmative defense but a basis for immunity from suit, a ruling on its applicability should be made at the earliest possible moment in a litigation. *Maxwell v. City of Indianapolis*, 998 F.2d 431, 435 (7th Cir. 1993) (citing *Hunter v. Bryant*, 502 U.S. 224, ——, 112 S.Ct. 534, 536, 116 L.Ed.2d 589 (1991)). Police officers, as public officials, are entitled to qualified immunity for their official actions if "a reasonable officer *could have believed* [the action taken was] lawful, in light of clearly established law and the information the officers possessed." *Anderson v. Creighton*, 483 U.S. 635, 641, 107 S.Ct. 3034, 3040, 97 L.Ed.2d 523 (1987) (emphasis added); *Estate of Starks v. Enyart*, 5 F.3d 230, 233 (7th Cir.1993). Qualified immunity will apply to an officer's alleged misconduct unless (1) the plaintiff's constitutional rights were violated, and (2) these rights were "clearly established" at the time the alleged violation occurred. *See Harms v. Godinez*, 829 F.Supp. 259, 264 (N.D.Ill.1993). "In determining whether the right alleged to have been violated was 'clearly established,' the constitutional right must be identified in a particularized sense with respect to the circumstances of the alleged violation." *Warlick v. Cross*, 969 F.2d 303, 309 (7th Cir.1992). The plaintiff must prove that the alleged violation was "clearly established" by citing closely analogous caselaw or introducing evidence that the alleged conduct was "so

patently violative of the constitutional right that reasonable officials would know without guidance from the courts." *Casteel v. Pieschek*, 3 F.3d 1050, 1053 (7th Cir.1993).

■ The first constitutional violation alleged by plaintiff is Bradley's entry into Alto's home without an arrest warrant or consent. To be sure, the Fourth Amendment prohibits police from conducting a warrantless, nonconsensual entry into a suspect's home solely for the purpose of effectuating a felony arrest. *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). Equally apparent is that this principle was "clearly established" by October, 1991. Therefore, unless Bradley's entry falls within one of the exceptions to this rule, he will be precluded from claiming qualified immunity. *See Payton*, 445 U.S. at 590, 100 S.Ct. at 1382.

For present purposes, the exigency exception to the warrant requirement is most relevant. Simply stated, where probable cause exists and exigent circumstances make it reasonable for police to proceed into a home without a warrant, there is no constitutional violation. *See Reardon v. Wroan*, 811 F.2d 1025, 1029 (7th Cir.1987). In the instant case, Bradley did not enter Alto's home solely for the purpose of conducting a "routine" felony arrest. *See United States v. Pace*, 898 F.2d 1218, 1229 (7th Cir.1990) (distinguishing *Payton* as a "routine" arrest as opposed to one involving exigent circumstances), *cert. denied*, 497 U.S. 1030, 110 S.Ct. 3286, 111 L.Ed.2d 795 (1990). Rather, Bradley arrived on the scene after learning of the suspect's flight from Officers Love and Grey. An officer conducting an otherwise proper arrest in public need not abandon his efforts simply because the suspect flees into his own house. *See United States v. Santana*, 427 U.S. 38, 42–43, 96 S.Ct. 2406, 2409–10, 49 L.Ed.2d 300 (1976). Likewise, an officer who stops a person because of a reasonable, articulable suspicion of criminal activity, *see Terry v.*

---

**3.** Plaintiff does not assert that Bradley intentionally shot Alto during their scuffle, since he agrees with paragraph 56 of defendant's 12(m) statement of uncontested facts, which reads in part: "Bradley did not feel the trigger being pulled and does not know how the gun discharged." *See*

*Campbell v. White*, 916 F.2d 421 (7th Cir.1990) (accidental collision with fleeing suspect not seizure within Fourth Amendment), *cert. denied*, 499 U.S. 922, 111 S.Ct. 1314, 113 L.Ed.2d 248 (1991).

*Ohio,* 392 U.S. 1, 22, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968), need not terminate the stop merely because the suspect flees to his home. *See Pace,* 898 F.2d at 1228–29; *Harbin v. City of Alexandria,* 712 F.Supp. 67, 71–72 (E.D.Va.1989) (*Terry* stop need not end when suspect walks from porch into house), *aff'd,* 908 F.2d 967 (4th Cir.1990). Indeed, "a suspect's actual flight from an officer may certainly provide information to ripen an officer's preexisting suspicions into probable cause." *Tom v. Voida,* 963 F.2d 952, 960 (7th Cir.1992). Thus, where an officer is in "hot pursuit" of a suspect fleeing a *Terry* stop, exigent circumstances may exist sufficient to justify a warrantless arrest of the person in his home.

In the instant case, Love recognized Alto as Officer Perkins's assailant and sought to question him. Before Love and Grey could question Alto, he broke free and fled to his home. The officers were not required to halt the *Terry* stop simply because Alto sought refuge in his home. *Pace,* 898 F.2d at 1228–29. Rather, because Alto attempted to escape from Love, and defied her reasonable request to stop, the officers had probable cause to arrest Alto. *See United States v. Weaver,* 8 F.3d 1240, 1244 (7th Cir.1993) (suspect's evasive maneuvers justified the use of force to stop him). Therefore, since Bradley was aware of Alto's flight from Love and Grey, he reasonably could have believed that he had sufficient justification to enter Alto's house to effectuate a *Terry* stop, if not a full arrest. *See O'Leary v. Luongo,* 692 F.Supp. 893, 902 (N.D.Ill.1988) (absent evidence otherwise, responding to another officer's call for assistance gives responding officer probable cause).

Moreover, Bradley was aware that Alto was brandishing a knife and refusing Love's request to put down the weapon. The explosiveness of the situation and the potential for injury to Bradley's fellow officers (as well as members of Alto's household) created further justification for immediate entry. *See United States v. Richards,* 937 F.2d 1287, 1290–91 (7th Cir.1991) (officers entitled to enter apartment to act in self-defense and effectuate an arrest for ongoing assault). Although Bradley was unaware of the actual crime that Alto had been accused of committing, the exigency created by Alto's threatening use of a knife outweighed Bradley's ignorance of Alto's prior crime. *See Reardon,* 811 F.2d at 1029 (noting that summary judgment is appropriate where exigency is sufficiently extreme to compensate for officer's lack of information).

Plaintiff correctly observes that Alto's initial offense of aggravated assault was a misdemeanor, and could not by itself justify a warrantless arrest of Alto in his home. *See Welsh v. Wisconsin,* 466 U.S. 740, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984). In *Welsh,* the Court held that the gravity of the underlying offense—in that case a noncriminal, civil forfeiture offense—should be considered when deciding whether exigent circumstances existed. *Id.* at 753, 104 S.Ct. at 2099 (relying on nature of offense and lack of "hot pursuit" or threat to public in finding no exigent circumstances). In the instant case, however, Alto allegedly committed an aggravated assault against a police officer.[4] In addition, Love and Grey were in "hot pursuit" of Alto, and were not required to halt their pursuit simply because Alto sought sanctuary in his home. Furthermore, the ongoing assault of Officer Love and her fellow officers with a knife created an exigent circumstance despite the nonfelonious nature of the underlying offense. Therefore, since Bradley reasonably could have believed that his entry into Alto's home did not violate a "clearly established" constitutional right, he is shielded from civil liability for that act.[5]

---

4. Although aggravated assault is only a misdemeanor in Illinois, 720 ILCS 5/12–2 (1992), it cannot be disputed that such a violent offense would justify Love and Grey's stop of Alto in the park, as well as his subsequent arrest.

5. Plaintiff counters Bradley's claims of qualified immunity by introducing testimony from two experts of law enforcement procedures, who opine that Bradley's actions were unreasonable under the circumstances. However, this evidence is not particularly helpful when determining whether qualified immunity applies. Although these particular experts may believe Bradley's actions to be unreasonable, their testimony does not establish that Bradley violated a clearly established constitutional right. *See Liebenstein v. Crowe,* 826 F.Supp. 1174, 1186 (E.D.Wis.1992). (expert testimony not sufficient to defeat summary judge-

■ We next examine plaintiff's claim that Bradley violated Alto's constitutional rights by entering the house with his weapon drawn. Such a claim of excessive force is evaluated under the Fourth Amendment test for objective reasonableness. *Graham v. Connor,* 490 U.S. 386, 397, 109 S.Ct. 1865, 1872, 104 L.Ed.2d 443 (1989); *Tom v. Voida,* 963 F.2d 952, 958 (7th Cir.1992). To be more precise, we must decide whether "at the time of the alleged seizure [by excessive force], a reasonable officer *could have believed* that [the defendant's] conduct was constitutional...." *McDonald v. Haskins,* 966 F.2d 292, 293 (7th Cir.1992) (emphasis added). Such a determination is made by examining factors such as

> the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of others, and whether he is actively resisting arrest or attempting to evade arrest by flight.... The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

*Graham,* 490 U.S. at 396–97, 109 S.Ct. at 1872.

We find that Bradley did not violate any clearly established law in entering Alto's home with his weapon drawn. Clearly, Bradley would not have been entitled to use deadly force if Alto did not pose an imminent threat to himself or others or had not committed a violent crime. *See Tennessee v. Garner,* 471 U.S. 1, 11, 105 S.Ct. 1694, 1701, 85 L.Ed.2d 1 (1985). However, Bradley knew that Alto had fled arrest and was currently threatening fellow officers with a knife. Although he did not know how close Alto was to the officers, Bradley reasonably

could have believed that because of the dangerous nature of the situation, as well as the potential for escalation, the use of his weapon to subdue Alto was reasonably necessary. In *Liebenstein v. Crowe,* 826 F.Supp. 1174, 1186 (E.D.Wis.1992), the court held that qualified immunity applied to police officers who used deadly force on a suspect without warning because the suspect was rapidly firing his rifle in an indiscriminate manner. Because the court could not find such actions clearly unreasonable under the circumstances, qualified immunity was appropriate. *Id.* Similarly, we cannot say that Bradley's decision to draw his weapon was clearly unreasonable under the circumstances.

Furthermore, this is not a case where an officer unreasonably created conditions justifying the use of deadly force. *See Enyart,* 5 F.3d at 234 (precluding officer who stepped in path of speeding car from prevailing on summary judgment). Alto's flight from Love and Grey, his wielding of a dangerous weapon, and his failure to follow the officers' orders to throw down the weapon were all voluntary acts that justified Bradley's use of deadly force in entering the house with his gun drawn. *See id.* at 235 (deadly force may be warranted where fleeing felon willfully creates dangerous situation). Therefore, given the potential for dangerous conflict and the failure of plaintiff to demonstrate that a "clearly established" right was violated, Bradley is entitled to qualified immunity for the drawing of his weapon when entering Alto's home.

### B. State Claims (Counts III and IV)

■ Defendant Bradley also moves for summary judgment on plaintiff's state law claims brought under the Illinois Survival Act and the Illinois Wrongful Death Statute.[6] Bradley contends that he is entitled to summary judgment because the Illinois Local

---

ment on the use of excessive force). Unless plaintiff can point to closely analogous caselaw or demonstrate that Bradley's actions were so blatantly violative of Alto's constitutional rights that Bradley should have known of it, he will be unable to demonstrate that the right at issue was "clearly established." *Casteel,* 3 F.3d at 1053.

**6.** Normally, when granting summary judgment on federal causes of action we would dismiss

additional state claims under our discretionary application of supplemental jurisdiction. *See Simkunas v. Tardi,* 720 F.Supp. 687, 699 (N.D.Ill. 1989), *aff'd,* 930 F.2d 1287 (7th Cir.1991). However, because Bradley's motion does not dispose of the claims against the other defendants, we retain jurisdiction over the state law claims against Bradley.

Government and Governmental Employees Tort Immunity Act, 745 ILCS 10/2–202 (1993), protects him from liability for his official actions unless his conduct was "willful and wanton." Illinois law defines willful and wanton as "a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others or their property." 745 ILCS 10/1–210 (1993). Such claims against police officers are not generally suitable for resolution at the summary judgment phase, since the issue of "[w]hether [a] defendant['s] acts amounted to willful and wanton misconduct is a question of fact to be resolved by the jury based on the circumstances of the case." *Medina v. City of Chicago*, 238 Ill. App.3d 385, 179 Ill.Dec. 658, 606 N.E.2d 490, 496 (1992), *appeal denied*, 149 Ill.2d 651, 183 Ill.Dec. 863, 612 N.E.2d 515 (1993); *Glover v. City of Chicago*, 106 Ill.App.3d 1066, 62 Ill. Dec. 597, 436 N.E.2d 623 (1982). Thus, so long as sufficient evidence has been presented on the issue, the matter should be left for the trier of fact to decide. *See Bragado v. City of Zion/Police Department*, 788 F.Supp. 366, 372 (N.D.Ill.1992).

We find that although Bradley is immune from federal claims due to qualified immunity, we cannot say for certain that insufficient evidence has been presented on the issue of whether Bradley acted willfully and wantonly. Despite the fact that a reasonable officer in Bradley's position could have believed he was justified in drawing his weapon, a jury may well find that Bradley himself acted with "utter indifference" or "conscious disregard" sufficient to hold him liable. Bradley did not know what crime Alto was suspected of committing, nor did he know the exact location of Alto in relation to his fellow officers. Further, Bradley kept his weapon drawn while attempting to handcuff Alto. All these facts, taken in the light most favorable to the plaintiff, could support a finding by the jury of willful and wanton misconduct. We therefore deny Bradley's motion for summary judgment on the state claims in Counts III and IV of plaintiff's complaint.

## IV. Conclusion

For the reasons set forth above, defendant's motion for summary judgment is granted in part and denied in part. It is so ordered.